United States District Court
Southern District of Texas

**ENTERED**

May 02, 2018

David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

BIBBY OFFSHORE LIMITED,                    §
                                           §
            Plaintiff,                     §
VS.                                        §   CIVIL ACTION NO. 2:17-CV-33
                                           §
EMAS CHIYODA SUBSEA, INC., *et al*,        §
                                           §
            Defendants.                    §

## MEMORANDUM AND RECOMMENDATION

This case, filed on January 24, 2017, arises from a maritime contract dispute

between Plaintiff Bibby Offshore Limited ("Bibby") and Emas Chiyoda Subsea, Inc.

("EMAS").  (D.E. 1 and 43).  Bibby moved for and was granted a writ of attachment

commanding the seizure of the M/V LEWEK EXPRESS ("the Vessel") pursuant to Rule

C of the Supplemental Rules for Admiralty or Maritime Claims.  (D.E. 43, Page 7 and

D.E. 47).[1]  In its Amended Verified Complaint, Motion for Sale and Motion for Summary

Judgment, Bibby alleges it is entitled to a maritime lien against the Vessel for providing

"necessaries."  (D.E. 43; D.E. 106; and D.E. 144).  Ocean Lion, making a restricted

---

[1]EMAS is no longer a party to this action.  On March 9, 2017, an order staying this case was
entered due to the suggestion of bankruptcy filed by EMAS.  (D.E. 50 and D.E. 51).  On May 30,
2017, Bibby sought and received permission from the bankruptcy court to proceed in this Court
(1) with a Rule C *in rem* claim against the Vessel, which is owned by Ocean Lion Shipping Ltd.
("Ocean Lion") and was chartered by EMAS (D.E. 144-5), and (2) to voluntarily dismiss the
Rule B *in personam* claim against EMAS.  (D.E. 64-5); *In Re: Emas Chiyoda Subsea Ltd., et al.*,
Case No. 17-31146 (S.D. Tex. Bankr. Court May 30, 2017) (Order Lifting Stay).  Plaintiff then
voluntarily dismissed all of its claims against EMAS, filing an Amended Verified Complaint
adding a Rule C *in rem* claim against the Vessel.  (D.E. 43, D.E. 65 and D.E. 70).

appearance as claimant and owner of the Vessel pursuant to Rule E(8) of the Supplemental Rules for Admiralty Or Maritime Claims,[2] asserts the arrest should be vacated and/or summary judgment granted as the services performed by Bibby were not "necessaries" and were not provided "to a vessel" pursuant to the Commercial Instruments and Maritime Liens Act, 46 U.S.C. § 31301 *et seq*. Ocean Lion also seeks damages from Bibby for wrongful arrest of the Vessel. (D.E. 148 and D.E. 153). Additionally, Subsea 7 (US) LLC ("Subsea") filed an intervening complaint on December 11, 2017 and alleges it is entitled to *custodia legis* expenses which Ocean Lion has moved be stricken.[3] (D.E. 131; D.E. 142 and D.E. 145).

Having reviewed the parties' pleadings, responses and replies, the undersigned recommends Ocean Lion's Motion to Vacate/Motion for Summary Judgment (D.E. 148) be **GRANTED** as discussed below and Bibby's Motion for Summary Judgment and Motion for Sale of Vessel be **DENIED**. (D.E. 106 and D.E. 144). The undersigned further recommends the maritime attachment as to the Vessel be **VACATED** and the United States Marshal Service be directed to lift the attachment as to the Vessel and the Vessel be allowed to depart the jurisdiction of the Court. The undersigned further

---

[2]Rule E(8) provides, "An appearance to defend against an admiralty or maritime claim with respect to which there has been issued process in rem, or process of attachment and garnishment, may be expressly restricted to the defense of such claim, and in that event is not an appearance for the purposes of any other claim with respect to which such process is not available or has not been served."

[3]Several intervening complaints have been filed but all but one have since been settled and dismissed, leaving Bibby and Subsea as the only parties with remaining claims against the Vessel. (D.E. 37, D.E. 63, D.E. 72, D.E. 83, D.E. 84, D.E. 128, D.E. 129, D.E. 131 and D.E. 134). Therefore, the undersigned does not address the previous intervening complaints or parties below.

recommends Subseas' Motion for Approval of *Custodia Legis Expenses* be **DENIED** and

its intervening complaint be **DISMISSED**.  (D.E. 131; D.E. 142 and D.E. 145).

## I.    JURISDICTION

This Court has jurisdiction over maritime claims pursuant to 28 U.S.C. § 1333.

## II.    BACKGROUND

BHP Billiton ("BHP") is currently developing, in at least three phases, an oil and

gas field located off the coast of Trinidad and Tobago known as the Angostura Field.

There are three contracts involved in this matter related to the third phase of

development, the overall purpose of which was to install three subsea gas production

wells and then to connect those wells by subsea flow lines to two oil platforms, the

ARIPO and GEP, installed during an earlier phase of development.  (D.E. 148-3, Page

43).  The first is a contract between EMAS and BHP where EMAS agreed to perform

installation, tie-in and subsea work for BHP.  (D.E. 144-1, Page 3 and D.E. 148, Page 3).[4]

The second contract is a sixty (60) month bareboat charter agreement where, in

December 2014, EMAS chartered the Vessel, a reeled pipe-lay vessel specially designed

and equipped to lower flexible oil and gas pipelines to the seafloor, from Ocean Lion.

(D.E. 144-5).  The third is an Offshore Installation Services Agreement ("OISA") entered

into in early June 2015 between Bibby Subsea ROV, LLC ("Bibby ROV") and EMAS

where Bibby ROV agreed to provide certain goods and services to EMAS, including the

use of certain vessels owned and/or operated by Bibby ROV or a related or affiliated

---

[4]This contract is not part of the summary judgment record although both Bibby and Ocean Lion
have referenced it throughout their pleadings in this case.  Neither are parties to this contract.

company.  (D.E. 43, Page 4; D.E. 144-1, Page 3 and D.E. 148-1).  Bibby was then nominated by Bibby Subsea ROV, LLC to perform work on its behalf under the OISA and a work order was signed between Bibby and EMAS in early May 2016.  (D.E. 148-3).  In this work order, Bibby identifies the M/V BIBBY SAPPHIRE as the vessel involved in performing Bibby's contracted diving and engineering work.  (D.E. 148-3, Page 1, Paragraph 1 "Scope").  Bibby, as detailed in the work order, was to perform the following scope of work:

> The purpose of this document is to outline the scope of work (SOW) for the diving support of the BHP Angostura Phase 3 Development.  Diving support operations will include:  engineering, metrology, jacket prep working including cleaning, J-Tube and Riser Clamp Installation, J-Tube and Riser Installation, Riser Guard Installation, Spool Installation, Flexible Jumper Tie-In and any ancillary equipment associated with these operations in Trinidad at the GEP and ARIPO Jackets."

(D.E. 148-3, Page 44).

On January 24, 2017, Bibby filed its verified complaint for attachment in this admiralty and maritime action, alleging a Rule B *in personam* claim against EMAS because EMAS failed to pay $14,710,495.25 of the total invoiced amounts.  (D.E. 1).  On February 17, 2017, Bibby filed an Amended Complaint, adding a Rule C claim *in rem* against the Vessel.  (D.E. 43).[5]  On March 9, 2017, an order staying this case was entered due to the suggestion of bankruptcy filed by EMAS on March 8, 2017.  (D.E. 50 and D.E. 51).  On May 30, 2017, the bankruptcy court lifted the automatic stay permitting Bibby to

---

[5]Two vessels were initially subject to maritime attachment, however, only the Vessel remains attached as the undersigned, on February 22, 2017, lifted the attachment on the other vessel, upon motion of its owner, finding EMAS could be found within the Southern District of Texas and therefore, the requirements of Rule B had not been met.  (D.E. 27 and D.E. 49).

(1) proceed with its pending Rule C *in rem* claim against the Vessel and (2) to voluntarily dismiss the Rule B *in personam* claim against EMAS.  *In Re: Emas Chiyoda Subsea Ltd., et al.*, Case No. 17-31146 (S.D. Tex. Bankr. Court May 30, 2017) (Order Lifting Stay).

On June 5, 2017, Ocean Lion filed its first Motion to Vacate the attachment, which Bibby opposed.  (D.E. 64, D.E. 66, D.E. 73 and D.E. 74).[6]  Bibby, among other arguments, asserted that "Bibby's equipment was used aboard the [Vessel], and some of Bibby's deck foremen and riggers directly assisted with operations on the [Vessel]" and "Bibby's services were provided directly to the [Vessel]."  (D.E.66, Pages 4, 8 and 18, D.E. 66-1, Page 3 and D.E. 74, Page 5).  The undersigned denied Ocean Lion's Motion to Vacate on July 28, 2017, finding Bibby had "alleged sufficient facts that, if substantiated, would support this Court's *in rem* jurisdiction" and "a period of time to conduct discovery to determine the extent of the services provided by Bibby in relation to the [Vessel]" was appropriate.  (D.E. 80, Page 8).[7]  The parties were then given until January 16, 2018 to conduct discovery.  (D.E. 87).[8]  On September 18, 2017, Bibby, along with several other intervenors, filed the pending Opposed Motion for Sale of the Vessel to which Ocean Lion filed a response in opposition.  (D.E. 106 and D.E. 119).

---

[6]In its response, Bibby requested "the opportunity to conduct discovery to better ascertain and develop the facts and circumstances attendant to Bibby's maritime lien against [the Vessel]." (D.E. 66, Page 2).

[7]The undersigned specifically stated a final decision on whether Bibby provided services which qualified as necessaries was not being made at that time.  (D.E. 80, Page 8).

[8]On August 11, 2017, Ocean Lion filed objections to the undersigned's July 28, 2017 Order to which Bibby responded, again asserting, among other arguments, that "Bibby's equipment was used aboard the [Vessel], and some of Bibby's deck foremen and riggers directly assisted with operations on the [Vessel]" and "Bibby's services were provided directly to the [Vessel]."  (D.E. 97 and D.E. 103, Pages 3 and 17-18).  Bibby also argued for a period of time to conduct discovery.  (D.E. 103, Pages 18-20).

Also on September 18, 2017, Subsea filed an Unopposed Motion to Intervene and a Motion to Compel the arresting parties, including Bibby, to move the Vessel from its facility which it had recently purchased from EMAS' bankruptcy estate on June 29, 2017. (D.E. 107 and D.E. 108).  In its Motion to Compel, Subsea reserved its right to recover all *custodia legis* costs and expenses.  (D.E. 108, Page 3).  Ocean Lion, as owner of the Vessel, joined Subsea's Motion on September 20, 2017, agreeing to pay for the costs associated with the move and to pay all dockage fees for the Vessel after the move.  (D.E. 111).  On September 21, 2017, both motions were granted. (D.E. 112 and D.E. 114).[9]  On December 11, 2017, Subsea filed an Intervening Complaint against the Vessel asserting it was owed $1,010,000.00, representing dockage fees at a rate of $10,000.00 per day for the period of June 29, 2017 to October 7, 2017.  (D.E. 131).

On January 25, 2018, Ocean Lion and Bibby jointly requested a continuation of the deadline for dispositive motions which was granted, extending the deadline to March 2, 2018.  (D.E. 140 and D.E. 141).  On February 1, 2018, Ocean Lion filed the pending Motion to Strike and/or Dismiss Subsea's Intervening Complaint to which Subsea filed a response.  (D.E. 142 and D.E. 143).  On March 2, 2018, the parties filed the dispositive motions and Subsea filed the pending Motion for Approval of *Custodia Legis* Expenses. (D.E. 144, D.E. 145, and D.E. 148).  Responses and replies to these motions were filed, the last on April 10, 2018.  (D.E. 150, D.E. 151, D.E. 153, D.E 154, and D.E. 158).

---

[9]While the Vessel was subsequently moved on October 7, 2017, there was an issue immediately moving the Vessel because of certain United States Coast Guard requirements, specifically necessary certificates and inspections.  (D.E. 118).

## III.   LEGAL STANDARDS

### A.   SUMMARY JUDGMENT

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). The Court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251–52.  In making this determination, the Court must consider the record as a whole by reviewing all pleadings, depositions, affidavits, and admissions on file, and drawing all justifiable inferences in favor of the party opposing the motion. *Caboni v. Gen. Motors Corp*., 278 F.3d 448, 451 (5th Cir. 2002).

The Court may not weigh the evidence, or evaluate the credibility of witnesses. *Id*.  Furthermore, affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.  Fed. R. Civ. P. 56(c); *see also Cormier v. Pennzoil Exploration & Prod. Co.*, 969 F.2d 1559, 1561 (5th Cir. 1992) (refusing to consider affidavits that relied on hearsay statements); *Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir. 1987) (stating that courts cannot consider hearsay evidence in affidavits and depositions).  Unauthenticated and unverified documents do not constitute proper summary judgment evidence.  *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323. The evidence must be evaluated under the summary judgment standard to determine whether the moving party has shown the absence of a genuine issue of material fact. "[T]he substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.  If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, then the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

To sustain this burden, the nonmoving party cannot rest on the mere allegations of the pleadings. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 248.  The nonmovant may not rely merely on allegations, denials in a pleading or unsubstantiated assertions that a fact issue exists, but must set forth specific facts showing the existence of a genuine issue of material fact concerning every element of its cause(s) of action. *Morris v. Covan World Wide Moving, Inc.,* 144 F.3d 377, 380 (5th Cir. 1998).  "After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted." *Caboni*, 278 F.3d at 451.

Where there are cross-motions for summary judgment, the party bearing the burden of proof at trial must satisfy not only the initial burden of production on the summary judgment motion by showing that there is no genuine issue of material fact, but also the burden of persuasion on the claim itself by showing that it would be entitled to

judgment as a matter of law at trial.  *Martinez v. Refinery Terminal Fire Co.*, No. 2:11-cv-295, 2013 WL 6838864, at *4 (S.D. Tex. Dec. 27, 2013) (citing *Provenza v. Gulf South Admin. Serv., Inc.*, 67 F.Supp.2d 617, 619 (M.D. La. 1999)).  Each motion must be considered separately because each movant bears the burden of showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *Id.*(citing *Am. Int.'l Specialty Lines Ins. Co. v. Rentech Steel LLC*, 620 F.3d 558, 6662 (5th Cir. 2012)).  If there is no genuine issue of fact and one party is entitled to prevail as a matter of law, the court may render summary judgment.  *Id.* (citing *Shaw Constructors v. ICF Kaiser Eng'r, Inc.*, 395 F.3d 533, 539 (5th Cir. 2004)).

### B.   MOTION TO VACATE

Once a defendant's property has been attached, the defendant can move to vacate the attachment under Rule E(4)(f) of the Supplemental Rules for Admiralty and Maritime Claims.[10]   Rule E(4)(f) permits the Court to look beyond the complaint, consider evidentiary submissions by the parties, and to hold a hearing, if requested.  *White Rosebay Shipping S.A. v. HNA Grp. Co. Ltd.*, No. 2:12-cv-96, 2013 WL 441014, at *3 (S.D. Tex. Feb. 5, 2013) (citations omitted).  A ruling under Rule E(4)(f) is not intended to resolve the dispute between the parties, but "only to make a preliminary determination of whether there are reasonable grounds for issuance of the arrest warrant."  *Id.*

---

[10]Rule E(4)(f) provides in relevant part:  "Whenever property is arrested or attached, any person claiming an interest in it shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted consistent with these rules."

Courts have held that at a Rule E(4)(f) hearing, a plaintiff must show reasonable grounds for the arrest and attachment and that it should be maintained. *Seatrade Grp. N.V. v. 6,785.5 Tons of Cement*, No. H-05-2771, 2005 WL 3878026, at *2 (S.D. Tex. Dec. 7, 2005) (citations omitted); *see also Vinmar Int'l Ltd. v. MT CLIPPER MAKISHIO*, No. H-09-3829, 2009 WL 6567104, at *1 (S.D. Tex. Dec. 9, 2009) (citations omitted). "The plaintiff must show by a preponderance of the evidence that it is entitled to a valid lien." *Id*. (citation omitted).  "This requires the plaintiff to make a *prima facie* showing that it is entitled to the damages sought and secured by the arrest and attachment." *Id*.[11]

## IV.  MOTIONS FOR SUMMARY JUDGMENT AND MOTION TO VACATE

### A.  BIBBY'S SERVICES ARE NOT NECESSARIES TO THE VESSEL

A maritime lien may attach for "providing necessaries to a vessel on the order of the owner or a person authorized by the owner," unless the provider of the necessaries has waived its right to the lien.  46 U.S.C. § 31342 and 46 U.S.C. § 31305.  A charterer, in this case EMAS, is "presumed to have authority to procure necessaries for a vessel." 46 U.S.C. § 31341(a)(4)(B).  "Necessaries" include "repairs, supplies, towage, and the use of a dry dock or marine railway."  46 U.S.C. § 31301(4).  The person providing necessaries "(1) has a maritime lien on the vessel; (2) may bring a civil action *in rem* to

---

[11]Whether a hearing and discovery have taken place should be taken into consideration regarding the applicable standard.  *Olendorff Carriers GMBH & Co., Grand China Shipping (Hong Kong) Co., Ltd.*, No. 2:12-cv-74, 2013 WL 3937450, at *2 (S.D. Tex. July 30, 2013) (citations omitted) (While a plaintiff initially need only make a prima facie showing that a defendant is amenable to suit, when a district court permits jurisdictional discovery and conducts a full evidentiary hearing on the issue of jurisdiction, the plaintiff must then prove its jurisdictional facts by a preponderance of the evidence).

enforce the lien; and (3) is not required to allege or prove in the action that credit was given to the vessel." 46 U.S.C. §31341(1)-(3). The lien "aris[es] in favor of the creditor by operation of law as security for a debt or claim…and grants the creditor the right to appropriate the vessel, have it sold, and be repaid the debt from the proceeds." *Equilease Corp. v. M/V SAMPSON*, 793 F.2d 598, 602 (5th Cir. 1986) (citation omitted). "[T]o determine the validity of a maritime lien, courts must normally refer to statutory law or those liens that have been historically recognized in maritime law" as "[m]aritime liens are *stricti juris* and will not be extended by construction, analogy, or inference." *Liverpool and London S.S. Prot. And Indem. Ass'n Ltd. v. M/V ABRA*, 295 F.Supp.2d 674, 681 (M.D. La. 2003) (citing *Racal Survey U.S.A. v. M/V COUNT FLEET*, 231 F.3d 183, 192 (5th Cir. 2000) (citation omitted) and *Lake Charles Stevedores, Inc. v. PROFESSOR VLADIMIR POPOV MV*, 199 F.3d 220, 224 (5th Cir. 1999)).

Maritime liens for necessaries "secure creditors who provide supplies which are necessary to keep the ship going." *Effjohn Int'l Cruise Holdings, Inc.*, 346 F.3d 552, 556 (5th Cir. 2003) (citation omitted). The definition of "necessaries" is particular to the vessel. *Equilease*, 793 F.2d at 602. The focus should be "on the utility of the claimed necessary to vessel operation." *Gulf Marine and Indus. Supplies, Inc. v. M/V GOLDEN PRINCE*, 230 F.3d 178, 180 (5th Cir. 2000) (citing *Equilease*, 792 F.2d at 604). Physical delivery to the vessel is not a requirement and "most goods or services that are useful to the vessel, keep her out of danger, and enable her to perform her particular function" are considered necessaries. *Equilease*, 792 F.2d at 603 (citation omitted). "Necessaries are the things that a prudent owner would provide to enable a ship to perform well the

functions for which she has been engaged," including "money, labor and skill, and personal services as well as materials." *Id.* (citation omitted).

In this case, the undersigned recommends a maritime lien could not have attached because, contrary to Bibby's repeated assertions, the equipment and services it provided to EMAS were not "necessaries" to the Vessel. Bibby asserts it provided the M/V BIBBY SAPPHIRE, as well as diving and support personnel, to perform the necessary installation, tie-in and subsea work that was being performed by EMAS and the Vessel.[12] Bibby further asserts it worked in conjunction with the Vessel such that the Vessel could perform its particular function. (D.E. 144-1, Pages 14 and 18-19; D.E. 148-5, Pages 2-3; D.E. 158, Pages 2-3) (Services Bibby asserts were necessaries). However, the undersigned recommends Bibby performed services that were only tangentially related to the pipe laying services performed by the Vessel and therefore, these services do not qualify as necessaries entitling Bibby to a maritime lien. Further, Bibby has not cited, nor has the undersigned found, any cases standing for the proposition that a maritime lien arises when two vessels each perform their own tasks to complete a common project. *Gulf Marine*, 230 F.3d at 180 ("The absence of precedent signifies the weakness of [Plaintiff's] position [that legal services qualify as necessaries], since admiralty enjoys an unusually rich legal tradition and, more than nearly any other contemporary area of federal law, relies on venerable precedents where they exist.")

---

[12]Bibby's representative described its overall purpose in the project as "providing diving and subsea construction support services to EMAS, our client, in order that they can complete the – their overall scope of work to their client, BHP." (D.E. 148-2, Page 56).

As Bibby described it, the Vessel is a "flexible flow-line umbilical and rigid pipe-lay vessel" whose function is to "lay those types of product on the seabed for production, water injection, chemical injections, or umbilical control."  (D.E. 144-4, Pages 34-35). The Vessel does not have onboard diver support facilities and, therefore, does not have the capability to complete tie-in work by connecting cables or pipelines once they are placed on the seabed.  (D.E. 144-4, Pages 36-37 and 122).   Additionally, the Vessel is capable of performing its function, namely lowering pipeline to the seafloor, without Bibby's assistance.  (D.E. 144-4, Page 36).[13]   In contrast, the M/V BIBBY SAPPHIRE is "primarily a diving support and construction vessel" whose function on the Angostura project was to provide "diving support, construction support activity, and ROV services." (D.E. 144, Pages 37- 38).   The installation services Bibby performed using the M/V BIBBY SAPPHIRE and Bibby employees did not require the Vessel or its crew to be present.   In fact, Mr. Duncan testified when Bibby was performing its physical installation or adjustment services, mainly involving clamps, risers, and J-Tubes[14] on the ARIPO and GEP platforms, the Vessel would either move at least 500 meters away or to the other side of the platform to carry on with other work.  (D.E. 144-4, Pages 80-81).  In short, the Vessel would first perform its function by laying the pipeline on the seafloor

---

[13]Mr. Duncan, in addition to testifying that the Vessel was capable of lowering pipeline to the seafloor without Bibby's presence, further testified the M/V BIBBY SAPPHIRE, at the time the Vessel was lowering this pipeline, would be "potentially, in a different location of where the [Vessel] was at the time."  (D.E. 144-4, Page 36).  Mr. Duncan also testified that the Vessel's function was to simply lay cable or pipeline on the seabed.  (D.E. 144-4, Page 122).

[14]The clamps were used to hold the J-Tube, which is the J-shaped pipe that extends from the platforms to the pipes on the seafloor, and the riser is pulled through the J-Tube and is the main medium for receiving the oil back to the production facility.  (D.E. 144-4, Pages 75-77).

and then move off-site and then Bibby, using its own personnel and equipment from the M/V BIBBY SAPPHIRE, would make the tie-in connections between the sections of pipe as well as with the platform, performing its function.  (D.E. 144-4, Pages 81-82 and 135-136).[15]

Further, none of Bibby's other contracted duties, including project management, engineering, procurement, fabrication, transportation, mobilization and demobilization, and topside and subsea installation are "necessaries" to the Vessel.  (D.E. 148, Pages 5-20).  There is no mention or reference to the Vessel in the OISA, the Work Order, in any of the subsequent change orders between Bibby and EMAS or in the invoices Bibby issued to EMAS for the project.  (D.E. 148-1; D.E. 148-3; D.E. 148-4 and D.E. 152-1).

While Bibby relies heavily on the decision in *Total Safety*, asserting services provided in connection to a chartered vessel's subsea installation and repair work have been deemed necessaries when they enable the chartered vessel to perform the functions for which she has been engaged, the facts in this case are readily distinguishable.  (D.E. 144-1, Page 20); *Total Safety US, Inc. v. Con-Drive, LLC.*, No. H-08-272, 2009 WL 1794771, at *1 (S.D. Tex. June 23, 2009).  In *Total Safety*, the defendant chartered two vessels to engage in subsea pipe repair in "sour gas fields."[16]  *Id*.  The defendant then

---

[15]Mr. Duncan testified the Vessel was "the main installation vessel that EMAS would deploy on the project, and its specific mission was to install the flexible flow lines and the umbilicals." (D.E. 144-4, Page 121).  Bibby would then "carry out the final tie-ins, the final installation works, the final installation of the J-tube and the spool end of the riser onto the platform."  (D.E. 144-4, Page 122).

[16]"A sour gas field release hydrogen sulfide (H2S), a "toxic and potentially life-threatening gaseous chemical."  *Id*.

engaged plaintiff on several occasions to provide needed safety emergency equipment, namely self-contained breathing apparatuses and fixed gas detection systems, and to install this equipment *onboard each vessel*. *Id.* at *1-2.  The Court found furnishing and installing the safety equipment onboard each vessel qualified as necessaries because "this equipment was necessary for these vessels to complete their mission of subsea pipe repair in sour gas fields" and was such that "a prudent owner would provide to enable a ship to perform well the functions for which she has been engaged."  *Id*. at *5 (citing *Gulf Marine*, 230 F.3d at 180).  In contrast, no Bibby personnel worked onboard the Vessel and no equipment provided by Bibby was placed onboard on the Vessel.[17]  (D.E. 148-5).  While Bibby asserts it provided personnel and labor to work aboard the ARIPO and GEP platforms to directly assist the operations of the Vessel taking place at the platform, the only evidence in support of this assertion is the testimony and affidavit of Mr. Duncan. (D.E. 66-1; D.E. 144-1, Page 19; D.E. 144-4, Pages 21-22).[18]  Further, the only evidence regarding any interactions between Bibby and the Vessel is Mr. Duncan's testimony and his affidavits.  However, Mr. Duncan testified he has never been to the Angostura field where the work was performed and was instead relying on his review of daily project reports describing operations in the field.  (D.E. 144-4, Pages 21-22).  Ocean Lion

---

[17]This in contrast to Bibby's earlier representations it provided equipment, namely a hydramarine pump, that was used onboard the Vessel.  *See* D.E. 66, Page 2 and D.E. 66-1, Page 3 (June 26, 2017 affidavit from Mr. Duncan averring Bibby provided a hydramarine pump to EMAS for use onboard the Vessel);  D.E. 144-4, Page 21.

[18]Mr. Duncan averred "Bibby deck foreman and riggers were stationed on the nearby ARIPO platform, and Bibby's deck foreman and riggers assisted the M/V LEWEK EXPRESS with the lowering of riser clamps, various rigging operations, and other activities as needed by the M/V LEWEK EXPRESS."  (D.E. 66-1, Page 3).

asserts, and Bibby provides no contrary evidence, that the limited number of daily project reports produced to Ocean Lion do not mention any of these activities described by Mr. Duncan.  (D.E. 148, Page 25).[19]

In sum, the undersigned recommends the Vessel and Bibby performed related, but entirely separate, functions as part of EMAS' larger project and therefore, Bibby's services do not qualify as necessaries to the Vessel under maritime law.

### B.  RELIANCE ON EMAS' CREDIT PRECLUDES ANY ASSERTION OF A MARITIME LIEN

Further, even if there is a question of fact regarding whether the services provided by Bibby qualify as necessaries, in order for Bibby to claim a right to a federal maritime lien, it must also have relied on the credit of the Vessel when furnishing the services. *Equilease Corp. v. M/V SAMPSON*, 793 F.2d 598, 605-07 (5th Cir. 1986) (citation omitted).  While there is a strong presumption that a party supplying necessaries to a vessel acquires a maritime lien, this presumption may be attacked by "establishing the personal credit of the owner or charterer was solely relied upon."  *Id.* at 605 (citations omitted).   "To meet this burden, evidence must be produced that would permit the inference that the supplier purposefully intended to forego the lien."  *Id.* (citations omitted).  Therefore, Ocean Lion must prove that Bibby "deliberately intended to look

---

[19]In fact, Ocean Lion asserts only two reports mention the Vessel.  (D.E. 148, Page 25 and D.E. 148-6).  These reports indicate the M/V BIBBY SAPPHIRE was standing by 500 meters away from the ARIPO platform while the Vessel installed J-Tubes on the Platform and Bibby was "waiting on client—Lewek Express J-Tube Operations" to "Commence[] J-Tube Clamp E2 after J-Tube Installation."  (D.E. 148-6).

solely to the [EMAS'] personal credit and to forego the valuable privilege afforded it by law." *Id.* (citation omitted).

Ocean Lion asserts there is uncontradicted evidence in the record that Bibby did not rely on the credit of the vessel when it provided its services. (D.E. 148, Pages 32-37). Specifically, Ocean Lion cites to the deposition testimony of Bibby's designated representative, Andrew Duncan. (D.E. 148-2). Mr. Duncan, while being questioned about payment structure for its contract, was asked:

> Q:   What's –how do you recall the payment structure for this contract working?
> A:   Yep. So you have various, different milestones agreed to ensure that we are – we're kept in reasonable project financial performance.
> Q:   And the first of those milestones is 25 percent of the project management and engineering lump sum due upon contract signature.
> A:   Yep, that's correct.
>
> …
>
> Q:   Do you know whether EMAS paid the –the contract-signature payment?
> A:   Specifically, no, but I would assume that they would.
> Q:   And so any compensation due to Bibby in addition to that, Bibby was happy to work on EMAS' credit for that?
> A:   Yes.
> Q:   Was Bibby relying on anybody's credit, other than EMAS?
> A:   No.

The undersigned recommends this is clear testimonial evidence by Bibby, the party seeking to impose a federal maritime lien, that it did not rely on the credit of the Vessel. *Equilease*, 793 F.2d at 605-07; *see also Racal Survey U.S.A., Inc. v. M/V COUNT FLEET*, 231 F.3d 183, 191 (5th Cir. 2000) (Evidence revealed supplier looked solely to a

party other than vessels for payment and therefore, "supplier was not relying on the credit of the vessels" and "purposefully intended to forego its maritime lien"); *see also Maritrend, Inc. v. Serac & Co. (Shipping) Ltd.*, 348 F.3d 469, 473 (5th Cir. 2003) ("Taken together, *Equilease* and *Racal Survey* stand for the proposition that testimony regarding which party creditor relied on can be determinative of whether the maritime lien was waived.")   While Bibby has now submitted an affidavit from Mr. Duncan contradicting his prior deposition testimony, the undersigned recommends Ocean Lion's objections to this affidavit be sustained.[20]   *See Doe ex rel. Doe v. Dallas Indep. Sch. Dist.*, 220 F.3d 380, 386 (5th Cir. 2000) (A sham affidavit impeaches, without explanation, a plaintiff's prior sworn testimony and cannot be used to manufacture a dispute of fact merely to defeat a motion for summary judgment); *see also S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996) (same).   "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting

---

[20]Bibby has filed a March 2, 2018 of Andrew Duncan which states that:

During the corporate deposition, I was asked whether Bibby relied upon anybody else's credit besides EMAS.  During the corporate deposition, I was not asked whether Bibby relied upon the credit of the LEWEK EXPRESS.  At the time it was performing work for the LEWEK EXPRESS, Bibby did so on the credit of the vessel.  Bibby has always had an understanding of its rights under General Maritime Law, including its lien rights and its ability to proceed against a vessel *in rem* for work and services provided to that vessel.  At the time it was performing work for the LEWEK EXPRESS, Bibby was working on the credit of the LEWEK EXPRESS by virtue of its work for and with the vessel but also as a result of the perceived relationship between EMAS and the LEWEK EXPRESS.  Bibby never intended to rely solely on the credit of EMAS, but rather intended to rely upon the credit of EMAS and the credit of the LEWEK EXPRESS, which at the time the OISA was entered into, was believed to be owned by EMAS. The credit of EMAS and the LEWEK EXPRESS were considered one in the same given.  At no time, regardless of whether EMAS was the owner of the LEWEK EXPRESS, did Bibby ever intend to waive any lien or rights it had against the LEWEK EXPRESS.  In fact, Bibby has aggressively pursued its lien against the LEWEK EXPRESS.  (D.E. 144-6).

the affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Id*. (citations omitted).   Therefore, the undersigned recommends the disputed sections of Plaintiff's affidavit (D.E. 144-6, Pages 3-4, Paragraphs 18-26) are clearly contradicted by his deposition testimony as noted and should not be considered.   In addition to Mr. Duncan's testimony, as discussed above, there is no mention or reference to the Vessel in the OISA, in the Work Order, in any of the subsequent change orders between Bibby and EMAS or in the invoices Bibby issued to EMAS for the project.   (D.E. 148-1; D.E. 148-3; D.E. 148-4 and D.E. 152-1).   Therefore, the undersigned recommends Ocean Lion has proven Bibby looked solely to EMAS' credit, foregoing any maritime lien against the Vessel. *Equilease Corp.*, 793 F.2d at 605-07.[21]

### C.   WRONGFUL ARREST

Lastly, Ocean Lion asserts it is entitled to recover damages resulting from Bibby's wrongful arrest of the Vessel.   (D.E. 148, Pages 37-39).   Raising the same arguments as in its pending Motion to Vacate/Motion for Summary Judgment, Ocean Lion asserts "Bibby knew from the conception of this lawsuit that it did not provide any necessaries to the [Vessel] and did not rely on the credit of the [Vessel] when providing its services to EMAS."   (D.E. 148, Page 37).   Ocean Lion further asserts Bibby, when faced with Ocean Lion's first Motion to Vacate, falsely asserted it provided equipment onboard the Vessel

---

[21]As the undersigned has recommended dismissal is appropriate, the issue of reasonableness of Bibby's claimed expenses is not addressed in this M & R.   (D.E. 152, Pages 19-20 and D.E. 158, Pages 8-9).

and that Bibby personnel assisted with rigging operations of the Vessel.  (D.E. 148, Page 38).  Bibby responds that it filed this suit in good faith and, citing to a March 16, 2018 affidavit of Mr. Duncan, it "relied at all time on the advice of counsel" and "[u]nder General Maritime Law, this reliance is a complete bar to Ocean Lion's claim for wrongful arrest."  (D.E. 150, Page 16 and D.E. 150-1).[22]

The Fifth Circuit has held that "[t]o recover for wrongful arrest of a vessel, there must be (1) no bona fide claim of a maritime lien on the vessel and (2) a showing of 'bad faith, malice, or gross negligence on the part of the offending party…' and the burden of proof lies with the party alleging wrongful arrest." *Comar Marine, Corp. v. Raider Marine Logistics, L.L.C.*, 792 F.3d 564, 574-75 (5th Cir. 2015) (citations omitted). However, relying on "the advice of competent counsel, honestly sought and acted upon in good faith is alone a complete defense." *Id.* (citing *Frontera Fruit Co. v. Dowling*, 91 F.2d 293, 297 (5th Cir. 1937)) ("The reasons for the award of damages [in cases of wrongful arrest] are analogous to those in cases of malicious prosecution.")  Further,  "a party act[s] in good faith when there was a 'bona fide dispute over the validity of [the] lien' and 'the parties could have legitimately and honestly believed that the lien would stand up.'" *El Paso Prod. Gom, Inc. v. Smith*, No. No. 04-2121, 2009 WL 2990494, at *5 (E.D. La. Apr. 30, 2009) (citing *Cardinal Shipping Corp. v. M/S Seisho Maru*, 744 F.2d 461, 475 (5th Cir. 1984)).

---

[22]Bibby asserts a variety of other arguments which the undersigned finds are without merit and need not be addressed.

The undersigned has recommended above that Bibby does not have a valid claim for a maritime lien on the Vessel.  Further, the undersigned recommends there is some evidence supporting Ocean Lion's allegations of bad faith, as Bibby did represent to the Court that it provided both materials and crew directly to the Vessel and it did not, and it needed additional time to conduct discovery and then subsequently conducted none. However, the undersigned recommends this is insufficient to rise to the level of a wrongful seizure warranting damages.  More importantly, Bibby avers it relied on the advice of its counsel and as such, the undersigned recommends Ocean Lion does not have a claim for wrongful arrest.[23]  (D.E. 150-1).

## V.    SUBSEA'S *CUSTODIA LEGIS* FEES

Subsea has filed a Motion to Approve *Custodia Legis* Expenses, which Ocean Lion opposes.  (D.E. 142, D.E. 143, D.E. 145, D.E. 151 and D.E. 154). Specifically, Subsea seeks these expenses at a rate of $10,000.00 per day for the period from June 29, 2017 until the vessel was moved on October 7, 2017, totaling $1,010,000.00.   Subsea asserts it filed its Complaint in this case "to be reimbursed from the proceeds of the sale of the Vessel for the *custodia legis* fees it incurred while the Vessel was docked at Subsea 7's Facility."  (D.E. 143, Page 10).

"Although expenses and costs incurred while a vessel is under arrest and in judicial custody do not create a maritime lien, it is well established that 'services or

---

[23]The cases cited by Ocean Lion regarding discovery after a party asserts reliance on counsel as an essential element of his defense are readily distinguishable from this wrongful arrest claim and therefore, the undersigned does not believe additional discovery is needed.  (D.E. 153, Page 15).

property advanced to preserve and maintain the vessel under seizure, furnished upon authority of the court, should be allowed as *custodia legis* expenses.'" *Calogeras Marine Inc. v. M/V OCEAN LEADER*, No. 96-3614, 1997 WL 658984, at *3 (E.D. La. Oct. 21, 1997) (citation omitted).  In general, *custodial legis* expenses are given the very highest priority when distributing the proceeds from the sale of a vessel.  *Id.*  "Generally, services or property advanced to preserve and maintain the vessel under seizure, furnished upon authority of the court or of an officer of the court…should be allowed as *custodia legis fees*." *Assoc. Metals & Minerals Corp. v. ALEXANDER UNITY M/V,* 41 F.3d 1007, 1018 (5th Cir. 1995) (citation omitted).  "Even if such expenditures are made absent a court order, *custodia legis* expenses may be ordered by the court…if equity and good conscience so require." *Id.* (citations omitted).  "Dockage is a necessary part of a seized vessel's maintenance and preservation, and therefore, docking fees are difficult to dispute as unreasonable or unnecessary." *Louisiana Intern. Marine, L.L.C. v. Drilling Rig ATLAS CENTURY*, No. C-11-186, 2012 WL 2317541, at *2 (S.D. Tex. June 18, 2012). The party seeking to collect expenses as *custodia legis* bears the burden of proving that expenditures were necessarily or reasonably incurred and that they were reasonable in amount.  *Id.* at *1 (citations omitted).  "Despite the fact that they are paid first in priority from the proceeds of a vessel sale, *custodia legis* expenses do not constitute a maritime lien." *ITT Indus. Credit Co. v. M/V Richard C*, 617 F.Supp. 761, 768 (E.D. La. 1985) (citing *New York Dock Co. v. The Poznan*, 274 U.S. 117 (1927)).

Having considered the equitable issues raised by Subsea, the undersigned recommends Subsea not be awarded docking fees.  The Vessel was originally docked at a

facility owned by EMAS.  It is undisputed that EMAS failed to satisfy its contractual obligations with numerous parties including Bibby and Ocean Lion.  Subsea purchased the facility where the Vessel was originally docked from EMAS out of the bankruptcy estate fully aware of these facts.  Further, Subsea did not obtain Court approval for any docking fees after it acquired the property.  Additionally, while the events of Hurricane Harvey were beyond the parties' control, Subsea purchased this facility on the Texas Gulf Coast during hurricane season.  Also, if the undersigned's above recommendations are adopted, there will be no sale of the Vessel from which to deduct dockage fees.  Lastly, it appears to the undersigned that the fee Subsea is seeking is unreasonable as it is almost three times the amount Ocean Lion is currently paying for docking fees at a nearby facility.  All of these factors weigh against granting Subsea docking fees in this case. *Louisiana Intern. Marine,* 2012 WL 2317541 at *1 (Party seeking to collect expenses must prove the expenses sought are reasonable).  Therefore, the undersigned recommends Subsea's Motion be **DENIED** and its intervening complaint be **DISMISSED.**

## VI.    RECOMMENDATION

For the reasons stated above, the undersigned recommends Ocean Lion's Motion to Vacate/Motion for Summary Judgment (D.E. 148) be **GRANTED** as discussed below and Bibby's Motion for Summary Judgment and Motion for Sale of Vessel be **DENIED**. (D.E. 106 and D.E. 144).  The undersigned further recommends the maritime attachment as to the Vessel be **VACATED** and the United States Marshal Service be directed to lift the attachment as to the Vessel and the Vessel be allowed to depart the jurisdiction of the Court.  The undersigned further recommends Subseas' Motion for Approval of *Custodia*

*Legis Expenses* be **DENIED** and its intervening complaint be **DISMISSED**.  (D.E. 131;

D.E. 142 and D.E. 145).

Respectfully submitted this 1st day of May, 2018.

Jason B. Libby
United States Magistrate Judge

<u>NOTICE TO PARTIES</u>

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within **FOURTEEN (14) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to 28 U.S.C. § 636(b)(1)(c); Rule 72(b) of the Federal Rules of Civil Procedure; and Article IV, General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendations in a Magistrate Judge's report and recommendation within **FOURTEEN (14) DAYS** after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.  *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415 (5th Cir. 1996) (en banc).